**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1086

CRAIG CUNNINGHAM, on behalf of himself and all others similarly situated,

       Plaintiff – Appellant,

v.

DEBORAH S. LESTER, in her individual capacity; NAOMI E. JOHNSON, in her individual capacity; JESSICA JOLLIFFE, in her individual capacity,

       Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Deborah K. Chasanow, Senior District Judge. (1:18-cv-03486-DKC)

Submitted: January 29, 2021                       Decided: March 4, 2021

Before WILKINSON, AGEE, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Diaz joined.

Aytan Y. Bellin, BELLIN & ASSOCIATES LLC, White Plains, New York, for Appellant. Robert K. Hur, United States Attorney, Baltimore, Maryland, Jane E. Andersen, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellees.

WILKINSON, Circuit Judge:

Craig Cunningham, the named party in this putative class action lawsuit, filed a complaint against federal employees Deborah Lester, Naomi Johnson, and Jessica Joliffe in their individual capacities, alleging violations of the Telephone Consumer Protection Act (TCPA). The district court granted the defendants' motion to dismiss, finding that the federal government was the real party in interest and that the government had not waived its sovereign immunity. Because the defendants were acting in the course of their official duties and because the United States is the real party in interest, we affirm the district court's dismissal of this case on sovereign immunity grounds. Indeed, absent sovereign immunity, federal employees would be swept up in endless suits for damages for nothing more than doing their jobs.

I.

The Affordable Care Act (ACA) obliges the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services (CMS), to "establish a system" for ensuring that applicants "receive notice of eligibility for an applicable State health subsidy program." 42 U.S.C. §§ 18083(a), (b)(2), (e). To fulfill this obligation, CMS partnered with a private company that possessed the technological capacity to help CMS satisfy its statutory mandate in a cost-effective manner. This firm later merged with General Dynamics Informational Technology, Inc. (GDIT), which inherited the contractual relationship with CMS. The contract formally defining this public-private partnership required GDIT to support CMS's contact operations by calling individuals to inform them of their eligibility for participation in the subsidized health insurance plans offered through

2

the ACA's health insurance exchanges. At the relevant time, the defendants worked for CMS in connection with the CMS-GDIT contract. Lester was designated the "Contracting Officer," Johnson was the deputy director of the CMS Call Center Operations group, and Joliffe worked within the group.

Pursuant to the terms of the CMS-GDIT contract, the defendants provided GDIT with a script that read as follows:

> Hello, this is an important message from healthcare.gov. The deadline to enroll in a 2016 health insurance plan is coming soon. You may be able to qualify for financial help to make health insurance more affordable. With financial help, most people can find plans for $75 or less per month. Visit healthcare.gov today to see how much you can save. If you have questions, you can call the health insurance marketplace to talk to a trained enrollment specialist at 1-800-318-2596. That's 1-800-318-2596. We are available 24 hours a day and the call is free. Don't forget, the deadline to enroll is Tuesday, December 15. If you've already taken action, and have 2016 health coverage, please ignore this message. Thank you. Goodbye.

But rather than instruct GDIT to cause the above message to be delivered through a series of personal phone calls, the defendants instead instructed GDIT to pre-record the message using artificial voice technology and to deliver it to approximately 680,000 individuals—none of whom had previously consented to receive such a message—through the use of GDIT's automatic telephone dialing system. GDIT followed these instructions to the letter.

Craig Cunningham, a recipient of one of GDIT's "robocalls," filed a putative class-action lawsuit seeking damages and an injunction against GDIT, alleging that its automated phone call constituted a violation of the TCPA. In 2018, this court affirmed the district court's dismissal of the suit for lack of subject matter jurisdiction. *Cunningham v. General Dynamics Information Technology, Inc.*, 888 F.3d 640, 643 (4th Cir. 2018) (hereinafter,

3

"*Cunningham I*").  The panel decided the case, in relevant part, under *Yearsley v. W. A. Ross Construction Co.*, 309 U.S. 18 (1940), where the Supreme Court held that government contractors are immunized "from suit when the government authorized the contractor's actions and the government validly conferred that authorization." *Id.* (citing *Yearsley*, 309 U.S. at 20–21 (1940)). Cunningham's subsequent petition for *certiorari* was denied.

Cunningham, however, was undeterred.  Before long, he had returned to district court with a new complaint.  But this new complaint bore certain striking similarities to the old one.  The underlying injuries it alleged were substantially the same.  And like the old complaint, the new complaint sought relief under the TCPA.  The crucial distinctions lay in the caption and in the remedy sought.  For defendant GDIT, Cunningham had substituted defendants Lester, Johnson, and Joliffe, not as CMS officials, but solely in their individual capacities.  He also no longer sought an injunction but requested only monetary relief.

While acknowledging the ingenuity of Cunningham's reframing of the case, *Cunningham v. Lester*, 2020 WL 362821, at *6 (D. Md. Jan. 22, 2020), the district court nevertheless insisted on "look[ing] beyond the form of the complaint" to determine whether, despite the above changes, the federal government remained the real party in interest.  *Id.* at *3 (quoting *Martin v. Wood*, 772 F.3d 192, 195–96 (4th Cir. 2014)). Ultimately, the court concluded that it did.  Rejecting Cunningham's argument that the Supreme Court's decision in *Lewis v. Clarke*, 137 S. Ct. 1285 (2017), had effectively overruled this circuit's opinion in *Martin v. Wood*, the district court analyzed the complaint's allegations under *Martin*'s five-factor test.  Under *Martin*, it found that not just a majority, but all five of the relevant factors militated in favor of recognizing the federal

4

government as the real party in interest. This finding merged the new case into the old one, compelling the district court to dismiss Cunningham's complaint, as before, for lack of subject matter jurisdiction. A court, it explained, was constitutionally powerless to proceed where the federal government *qua* sovereign had not waived its immunity from suit. Cunningham filed this timely appeal. We review the district court's dismissal on these grounds *de novo*. *Pitt County v. Hotels.com, L.P.*, 553 F.3d 308, 311 (4th Cir. 2009).

## II.

Sovereign immunity from private suit is a weighty principle, foundational to our constitutional system. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984) (citing *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)). Beginning with *Hans*, the federal judiciary has long taken care to respect the limitations this doctrine imposes on its own jurisdiction, and not without reason. The government's sovereign immunity is both a testament to its dignity and a guarantor of its ability to act effectively in furtherance of the common good. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58 (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)); *Lizzi v. Alexander*, 255 F.3d 128, 137 (4th Cir. 2001).

In this spirit, the Supreme Court has long held that any waiver of sovereign immunity must be "unequivocally expressed in statutory text." *FAA v. Cooper*, 566 U.S. 284, 290 (2012). This standard is so central to sovereign immunity jurisprudence that the Court explicitly and routinely construes ambiguous text so as to obviate any inference of waiver. *Id.* The conduct of any such analysis is unnecessary here, however, because the

5

Supreme Court has already settled the question of whether the TCPA contains a waiver of sovereign immunity. It does not. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016) ("The United States and its agencies . . . are not subject to the TCPA's prohibitions because no statute lifts their immunity."). The panel in *Cunningham I* reaffirmed this binding precedent, *Cunningham I*, 888 F.3d at 645, 647–48, and neither party in the present action contests its validity or applicability here.

Because sovereign immunity would indisputably bar Cunningham's suit if it were brought against the government, identifying the real party in interest is now the decisive question. If, despite the form of Cunningham's caption, the government is the real party in interest, then this court is not a constitutionally proper forum for consideration of the allegations he raises in his complaint.

III.

If there is one unbroken thread in real-party-in-interest jurisprudence, it is a general refusal to privilege the form of a complaint over its substance. *Pennhurst* illustrates this tradition. In *Pennhurst*, the plaintiffs alleged that state officials employed at Pennhurst State School and Hospital failed to satisfy their state law obligations as to the conditions prevailing at that facility, and they sought relief in federal court. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S 89, 92 (1984). Sensitive to the sovereign immunity issues raised by this complaint, the Court underscored a distinction between relief that is truly sought against state officials and relief that, although nominally sought against state officials, is actually sought against the State itself. *Pennhurst*, 465 U.S. at 100–01. "The general rule," the Court explained, "is that relief sought nominally against an officer is in

6

fact against the sovereign if the decree would operate against the latter." *Id.* at 101 (quoting *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam)). Sovereign immunity bars suit in the latter instance "*regardless of whether [the plaintiff] seeks damages or injunctive relief.*" *Id.* at 102 (emphasis added). Aiming to remain "[in] touch with reality," the Court focused on the "*effect* of the relief sought"—"that a major state institution be closed and smaller state institutions be created and expansively funded." *Id.* at 107. It determined that to characterize such a judgment as not "operat[ing] against the State," especially where the state officials were acting solely in their official capacities, "would make the law a pretense." *Id.* (emphasis in original). Subsequent Supreme Court precedent has reinforced, rather than eroded, these central commitments. *See, e.g.*, *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 (1986).

Our own court embraced this principle in *Lizzi v. Alexander*, 255 F.3d 128, 136–37 (4th Cir. 2001). Later, in *Martin v. Wood*, 772 F.3d 192, 196 (4th Cir. 2014), it even articulated a five-factor test synthesizing *Pennhurst* and its offspring into a structured inquiry. Both *Lizzi* and *Martin* attended closely, for example, to whether the named defendants committed the complained-of conduct in the course of performing their official duties, or whether they acted *ultra vires* or in pursuit of private interests. *Lizzi*, 255 F.3d at 138; *Martin*, 772 F.3d at 196. The *Martin* test considers, specifically, the following questions:

> (1) were the alleged unlawful actions of the state officials tied inextricably to their official duties; (2) if the state officials had authorized the desired relief at the outset, would the burden have been borne by the State; (3) would a

judgment against the state officials be institutional in character, such that it would operate against the State; (4) were the actions of the state officials taken to further personal interests distinct from the State's interests; and (5) were the state officials' actions *ultra vires*."

772 F.3d at 196 (internal quotations and citations omitted).

Cunningham, however, contends that the *Martin* court's interpretation of the real-party-in-interest inquiry was fatally flawed, and that the Supreme Court's decision in *Lewis v. Clarke* proves it. In *Lewis*, the Court held that sovereign immunity did not shield a limousine driver employed by a tribal casino from a suit against him in his individual capacity for damages related to an accident he caused while transporting clients of the casino. Cunningham leans heavily on the Court's statement that "[p]ersonal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law" and that such officers "come to court as individuals . . . and the real party in interest is the individual, not the sovereign." *Lewis*, 137 S. Ct. at 1291. As long as the complaint names an individual in her personal capacity and seeks monetary relief not requiring the transfer of government property, Cunningham infers, sovereign immunity represents no jurisdictional bar.

We disagree. Read properly, the above passage is a statement about what is true of genuine personal-capacity suits, where, for example, individuals come to court as the real party in interest. Cunningham, however, misinterprets it as a statement about what the Court believes is true of *any* action pled as a personal capacity suit for monetary damages. Such a misinterpretation collapses the distinction between genuine and nominal personal-capacity suits and, rather conveniently for Cunningham's case, begs the question at issue

8

in favor of the very formalism that the Court's well-established jurisprudence has long disavowed. *See Coeur d'Alene*, 521 U.S. at 270 ("The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading.").

The context makes this especially clear. The *Lewis* Court does not merely note the caption and the type of remedy sought, and then rest its sovereign immunity analysis on those facts alone. Rather, almost immediately after the aforementioned passage, the Court states that "there is no reason to depart from *these general rules*" (emphasis added), and then lists the facts it considers pertinent to their application. *Lewis*, 137 S. Ct. at 1291. These facts include that Clarke was operating a vehicle in the scope of his employment, that the tort suit took as its object his "personal actions," and that the money judgment would not "operate against" the tribe. *Id.* Consideration of these factors indicates the operation of a broader standard than the one Cunningham purports to distill from *Lewis* and that standard is entirely consistent with our circuit's precedent in *Martin*. Ultimately, *Lewis* does not purport to break from the Court's substantive approach to its real-party-in-interest jurisprudence, and Cunningham supplies us with no compelling reason to extract any contrary holding.

## IV.

What remains, then, is the practical question of whether the defendants or the government is the real party in interest. Under our precedent in *Martin*, and the well-established tradition it embodies, this inquiry is not a difficult one. The statutory mandate at the center of this case is the requirement that CMS "establish a system" for ensuring that applicants "receive notice of eligibility for an applicable State health subsidy program."

42 U.S.C. §§ 18083(a), (b)(2), (e).  Unlike the defendant in *Lewis*, who was haled into court on account of his personal negligence, the defendants, as CMS employees, were plainly acting in furtherance of this federal mandate when they signed the contract with GDIT and instructed GDIT to place its automated calls.  The defendants' actions are simply not otherwise intelligible.  The possibility that the defendants may have been acting *ultra vires* is not alleged by either party.  And the notion that the defendants may have been acting in their own private interest is not plausible.   Furthermore, there is no indication in *Martin*, or in the pertinent Supreme Court precedent, that any of these inquiries into the substance of the case should be relaxed or omitted simply because Cunningham is not seeking an injunction.

And to consider, even briefly, against whom the judgment would operate and on whom its burden would fall reveals the enormity of what Cunningham is asking this court to do.  Though the money judgment would nominally fall on the defendants alone, remaining tethered to reality—as *Pennhurst* requires—means that we cannot avert our eyes from the effects that such a judgment will have on the State.  It is commonly observed, after all, that the State is not a natural person and that its power to act derives solely from the efforts of its agents.  *See, e.g., Pennhurst*, 465 U.S. at 114 n.25; *Berkman v. United States*, 957 F.2d 108, 112 (4th Cir. 1992).  If successful, Cunningham's putative class action suit could saddle three CMS employees, whose actions conformed to their official duties and statutory mandate, with a judgment worth hundreds of millions of dollars.  J.A. 14–15.  While CMS's statutory mandate would remain, the ability of any CMS employee to do what *Campbell* clearly permits the State to do—that is, to act in ways otherwise barred

10

by the TCPA—would vanish. Allowing Cunningham's case to proceed would reduce *Campbell* to a practical nullity.

That CMS would, consequently, be forced between a rock and a hard place is evident. On the one hand, CMS would be bound by a statutory mandate requiring it to contact hundreds of thousands, if not millions, of people. On the other hand, concern that its employees not face staggering liability would prevent CMS from using the tools and techniques well-adapted to satisfying that mandate. These tools and techniques include the use of cost-effective communications technology that many government agencies already use to comply with other congressional mandates, as well as contractual partnerships that would allow the government to leverage the advanced capacities and expertise of the private sector. *See* Letter from Wilbur Ross, Sec'y, Dep't of Commerce, to Ajit Pai, Chairman, FCC (Apr. 4, 2019) (noting that the Census Bureau and other federal agencies "use contractors to complete critical missions" requiring large-scale communication). The potential burdens faced by the sovereign tribe in *Lewis* were not at all comparable, in kind or degree, to the kind that CMS faces here. Attended by the immense costs of implementing a functional replacement, the viability of the CMS-GDIT contract would be the first and most immediate casualty.

But it would not be the last. Allowing Cunningham to sidestep the substantive focus of sovereign immunity doctrine through the subterfuge of artful pleading would open the door to repeat plays, in which the same pleading tactics are used, again and again, to hamstring other government agencies. The public-private partnerships that agencies commonly rely on to meet their statutory mandates would become vulnerable to attack by

11

litigants who, relying on this case, would artfully plead a waiver of sovereign immunity where no such congressional intent was ever expressed. This would reduce not just *Campbell*, but sovereign immunity writ large, to a nullity, exactly the step against which *Pennhurst* warned. *Pennhurst*, 465 U.S. at 112. The threat of such a heavy imposition on the executive's power to act in furtherance of legislative commands is a primary reason the Court has adhered to the effects-oriented approach to the real-party-in-interest inquiry, the approach we now apply in the case at bar.

We recognize the similarity between the claims in this litigation and the claims that Cunningham brought in his earlier lawsuit. We also recognize that both suits may have been motivated by disagreements with the policy judgments embodied in the ACA. And finally, we recognize that robocalls can be obnoxious, something recipients often choose to terminate at their inception. But to impair the ability of the government (or its contractors) to deliver telephonically a message on public health is well beyond judicial competence. The proper forum for "litigating" any such grievances is not a federal courtroom; it is the court of public opinion and the legislative branch. The Supreme Court's admonition that "considerations of policy cannot override the constitutional limitation on the authority of the federal judiciary to adjudicate suits" both instructs and binds us here. *Pennhurst*, 465 U.S. at 123.

V.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*

12